**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

SHELDON GECHT,                          )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )     No. 03 C 9129
                                        )
HELEN E.R. SAYLES, Senior Vice          )
President of Human Resources and        )
Administration, in her capacity as      )
Administrator of the Liberty Mutual     )
Severance Pay Plan, and LIBERTY         )
MUTUAL INSURANCE COMPANY,               )
                                        )
            Defendants.                 )


<u>**MEMORANDUM OPINION**</u>

Before the court are defendants' motion for summary judgment and defendants' motion to strike portions of plaintiff's statement of additional material facts. For the reasons explained below, defendants' motion for summary judgment is granted in part and denied in part, and defendants' motion to strike is denied.

<u>**BACKGROUND**</u>

Plaintiff, Sheldon Gecht, claims that defendants, Liberty Mutual Insurance Company and the Administrator of its Severance Pay Plan, Helen E.R. Sayles (collectively, "Liberty"), violated ERISA by failing to pay him the full amount of severance pay to which he was entitled and breached a contract by failing to pay him the full amount of a retention bonus. Liberty contends that plaintiff was

not unlawfully denied severance benefits because its interpretation of the plan was reasonable and that there was no breach.

The undisputed material facts are as follows. Gecht is a former employee of OneBeacon Corporation ("OneBeacon"), which was an insurance carrier that provided property and casualty insurance. As of October 2001, Gecht had been employed by OneBeacon for approximately twenty-eight years. He was eligible to receive severance benefits equal to one week of his base salary per year of service.

In early 2001, OneBeacon and Liberty entered into an agreement that Liberty would acquire certain OneBeacon business and a significant number of OneBeacon employees. The agreement contemplated that those employees would transfer to various of Liberty's subsidiaries, including its subsidiary Indiana Insurance Company ("Indiana Insurance"), a part of Liberty's Regional Agency Markets ("RAM") business unit. On October 30, 2001, OneBeacon and Liberty entered into a Master Agreement, which governed all of the terms and conditions of the transaction. Pursuant to the Master Agreement, Liberty offered employment to some of OneBeacon's employees.

On November 1, 2001, Liberty sent Gecht a letter offering him employment with Indiana Insurance, to begin on January 1, 2002. The offer letter stated in relevant part:

It is my pleasure to offer you employment with Indiana Insurance effective January 1, 2002.  If you accept this offer, the following information is applicable and also provides you with details regarding next steps.

As a current employee of a OneBeacon Group Company, your salary and benefits will remain the same through December 31, 2001, subject to your continued acceptable performance of the terms and conditions of your current position and title. . . .
. . .
On January 1, 2002, you will also become eligible for the various Liberty Mutual Benefits programs that you will elect within the next several weeks, including Medical, Dental, Vision, Life and Disability Plans.  You will receive more information about these programs, as well as information regarding eligibility for 401K, Retirement and Flexible Time Off and how to enroll in these programs. . . .
. . .
Please review this offer and indicate that you accept or decline it by signing and returning this letter to your local Human Resource representative within the next five (5) business days.

(Letter from Richard T. Bell, President and CEO of Liberty, to Sheldon Gecht, November 1, 2001, at 1-2, Ex. A to Declaration of Debra Waldstein, Ex. 2 to Defendants' Memorandum in Support of Motion for Summary Judgment.)  Gecht signed the letter on November 7, 2001.

On January 15, 2002, Liberty sent Gecht a letter offering him a retention bonus for which he would be eligible if his job was eliminated for reasons unrelated to performance.  The letter stated in pertinent part:

During your employment with the One Beacon organization, you made contributions to the company's completion of its business plans.  Now that you have migrated to the Indiana Insurance organization, your efforts are part of

our plans to continue servicing the OneBeacon business. I am pleased to inform you are eligible to receive a retention bonus in consideration of your work efforts during the transition period ahead.

The details regarding your eligibility for this retention bonus are outlined below.

Retention Payout
- Your retention payment will be 30% of your base pay as of 12/31/01 or $36,900.00 (before applicable taxes and withholding) subject to the terms and conditions outlined below, including continued acceptable performance of your job duties.

Retention Period
- *Period #1* ends August 1, 2002. If you remain employed through this date, subject to the conditions below, you will receive 30% of your bonus, or $11,070.00 (before applicable taxes and withholding).
- *Period #2* ends April 1, 2003. If you remain employed through this date, subject to the conditions below, you will receive 70% of your bonus, or $25,830.00 (before applicable taxes and withholding).
. . .

. . . If, prior to the payout date, the Company at its sole discretion, eliminates your position for any reason unrelated to your job performance, your award distribution will be paid to you on a pro-rata basis, based upon the length of time you were an active participant in the retention plan. If the Company, at its sole discretion, determines that your employment will extend beyond the end of the retention period of April 1, 2003, and your performance during the Retention Period has been satisfactory, you will be paid the Retention Payout as set forth above.

During the Retention Period, you will be eligible for employee benefits on the same basis as other employees with similar job equivalencies and length of service, including time off as eligible to be earned under the Company's FTO (Flexible Time Off) schedule. . . .

>. . . If you are in agreement with and accept the terms
and conditions of your employment as set forth above,
please sign, date, and return a copy of this letter to me
no later than January 22, 2002. . . .

(Letter from Robert J. Jacobson, Vice President, Personal Lines
Operations, to Sheldon Gecht ("Retention Bonus Agreement"), January
15, 2002, at 1-2, Ex. A to Declaration of Debra Waldstein, Ex. 2 to
Defendants' Memorandum in Support of Motion for Summary Judgment.)
Gecht signed the letter on January 21, 2002.

On February 27, 2002, Gecht received a letter from Liberty
informing him that his position was being eliminated, which read in
part:

>Restructuring of our Personal Lines Department will
result in the elimination of your current position
effective March 15, 2002. If it becomes necessary to
eliminate your position prior to March 15, 2002, and you
are still employed in your current position at the time
of that decision, you will be paid through March 15,
2002 and receive the severance benefit listed below.
. . .
If you do not accept a new position with the Company by
March 15, 2002, you will be eligible for the following:
>
>>1- The usual benefits available to terminating
employees (i.e., COBRA coverage for extending
medical benefits, conversion of life coverage
to an individual policy). . . .
>>
>>2- Severance pay as per the attached severance pay
plan. In order to receive severance, you must
work in your current position through March 15,
2002 and maintain continued good performance.
. . .
>>
>>3- You will receive a Prorated Retention Bonus, as
outlined in the retention bonus agreement in
the total amount of $10,701.00 (before
applicable taxes).

> You will receive a regular salary check, as well as
> payment for any applicable FTO time, in the first pay
> cycle following March 15, 2002.  Unless you notify us
> that you wish to receive a lump sum payment, you will
> receive your severance benefits in biweekly installments
> beginning with the first pay cycle following your last
> regular check. . . .

(Letter from Rob Jacobson and Teresa Daniels to Sheldon Gecht

("Separation Letter"), February 27, 2002, Ex. F to Plaintiff's Rule

56.1 Statement.)[1]  It appears that the copy of the severance pay

plan referred to as attached to the Separation Letter was not the

actual plan, but an undated, single-page "Severance Payment

Schedule" that states as follows:

> According the [sic] Master Agreement negotiated between
> OneBeacon Insurance and Liberty Mutual's Regional Agency
> Markets Group, the following schedule of severance
> payments applies to those OneBeacon Insurance employees
> who transfer employment to the Regional Agency Markets
> group effective January 1, 2002.
>
> This schedule will remain in effect through June 1, 2003.
>
> **Complete Years of Service**      **Severance Weeks**
> · · ·
>
>    26+                             1 week per year of
>                                    service
>
> · · ·

(Id.)

Shortly thereafter, Gecht received another letter stating in

part as follows:

---

[1] This letter, as it appears in defendants' submission of the materials
that were considered by the Plan Administrator, does not have the "attached
severance pay plan" referred to therein, but plaintiff's submission of the letter
does have an attached single-page "Severance Payment Schedule."

On February 27th, we met with you to communicate the timing for the elimination of your position. During this meeting, you were given a letter that discussed your eligibility for severance, post-employment benefits (such as COBRA), and a pro-rated payment of the retention bonus. The letter you received correctly referenced the original letter communicating the retention bonus on January 15, 2002; unfortunately, it has come to our attention that an administrative error caused the inclusion of an incorrect amount for your pro-rated retention bonus payout.

The retention bonus agreement, which you accepted and signed, stated that, "If, prior to the payout date, the Company at its sole discretion, eliminates your position for any reason unrelated to your job performance, your award distribution will be paid to you on a pro-rata basis, based upon the length of time you were an active participant in the retention plan." The first retention period runs from January 15th to August 1st, 2002, which is a total of 28 weeks.

The effective date of the elimination of your position is March 15, 2002. This date is 8 weeks from the original communication date of the retention bonuses. This represents 29% of the length of the first retention period. Your pro-rated retention payment, therefore, is $3,210.30 (or 29% of the first retention payment of $11,070.00 communicated on January 15th). Since the second retention period does not commence until August 1, 2002, there will be no payment under the second retention period.

We apologize for the confusion caused by this administrative error and trust that you understand why we must comply with the originally agreed retention plan. . . .

(Letter from Robert J. Jacobson and Loralie Levenhegen, Assistant Vice President, Human Resources, to Sheldon Gecht, March 8, 2002, at 1-2, Ex. A to Declaration of Debra Waldstein, Ex. 2 to Defendants' Memorandum in Support of Motion for Summary Judgment.)

On March 15, 2002, Gecht's position was eliminated, and his employment with Liberty therefore was terminated for a reason unrelated to performance. Thereafter, Gecht received a $68,596.24 lump-sum payout from Liberty, which Liberty viewed as the total amount of severance benefits that were due to Gecht (twenty-nine weeks of base salary based on twenty-nine years of service--one week severance pay for each year of service). Evidently, Gecht also received the recalculated $3,210.30 retention bonus.

Some months later, in December 2002, Gecht initiated an administrative appeal of Liberty's calculations of his severance pay and retention bonus. Gecht contended that he should have been awarded severance pay of fifty-two weeks of base salary pursuant to Liberty's Severance Payment Plan, which he had viewed on the Web site that Liberty had provided for former OneBeacon employees transferring to Liberty (www.lrambound.com). Gecht stated that attached to the letter of termination he received on February 26, 2002, he received a document called "Attachment A," which referred to the Master Agreement negotiated between OneBeacon and Liberty that exempted former OneBeacon employees from Liberty's Severance Pay Plan and provided different severance benefits for those employees. According to Gecht, "Attachment A" had never been disclosed to him prior to his termination and had not been posted on the www.lrambound.com Web site, either. Gecht did not indicate on what basis he was appealing the bonus calculation.

Liberty denied Gecht's appeal in a letter dated January 13, 2003, from Debra Waldstein, Liberty's Vice President of Employment and Employee Relations. In February 2003, Gecht appealed the first-level denial to Liberty's Plan Administrator, defendant Helen E.R. Sayles. In a letter dated May 22, 2003, Sayles denied the appeal and advised Gecht that the decision was final. We will quote from both letters denying Gecht's appeals in our discussion infra.

Gecht filed the instant action on December 18, 2003, alleging that Liberty "arbitrarily, capriciously, and unreasonably failed and refused to pay Plaintiff's severance pay of the promised amount of 52 weeks salary under the Liberty Mutual Severance Pay Plan and has only agreed to pay 29 weeks of Plaintiff's salary as severance" and "unlawfully reduced Plaintiff's retention bonus from $10,701.00 to $3,210.30." (Complaint, ¶ 6.) Plaintiff seeks $7,490.70 in bonus pay and $54,404.00 in severance pay, in addition to attorney's fees and costs.

Defendants now move for summary judgment as well as to strike portions of plaintiff's statement of additional material facts.

## DISCUSSION

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party

is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering such a motion, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. See Pitasi v. Gartner Group, Inc., 184 F.3d 709, 714 (7th Cir. 1999). "Summary judgment should be denied if the dispute is 'genuine': 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Talanda v. KFC Nat'l Mgmt. Co., 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." McGrath v. Gillis, 44 F.3d 567, 569 (7th Cir. 1995).

**A.** **Severance Pay**

The parties agree that Liberty's Severance Pay Plan (the "Plan") provides that the Plan Administrator retains the exclusive right and discretionary authority to interpret the Plan, decide all questions of eligibility, and determine the amount, time, and manner of payment of any Plan distribution. Thus, our review is limited to determining whether the denial of additional severance pay was "arbitrary and capricious." See Herzberger v. Standard Ins. Co., 205 F.3d 327, 331 (7th Cir. 2000).

"Under the arbitrary and capricious standard, a plan administrator's decision should not be overturned as long as (1) it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of relevant plan documents, or (3) the administrator has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem." Hess v. Hartford Life & Accident Ins. Co., 274 F.3d 456, 461 (7th Cir. 2001) (internal quotation marks omitted). Although the arbitrary and capricious standard grants significant deference to the plan's determination of eligibility, our review is not simply a "rubber stamp": "[I]f fiduciaries or administrators of an ERISA plan controvert the plain meaning of a plan, their actions are arbitrary and capricious." Swaback v. American Info. Techs. Corp., 103 F.3d 535, 540 (7th Cir. 1996). The arbitrary and capricious standard, though deferential, nonetheless requires "a rational connection between the issue to be decided, the evidence in the case, the text under consideration, and the conclusion reached." Exbom v. Central States, S.E. & S.W. Areas Health & Welfare Fund, 900 F.2d 1138, 1143 (7th Cir. 1990) (internal quotation marks omitted).

The reasons for Liberty's denial of severance pay beyond twenty-nine weeks' salary were provided in the January 13, 2003, and May 22, 2003 letters from Debra Waldstein and Helen E.R.

Sayles, respectively. We will quote the relevant portions of each letter, beginning with that of Sayles (which relies in part on the "chronology of events and communications" set forth by Waldstein):

> In accordance with the Claims and Appeals Procedure set forth in the Liberty Mutual Severance Pay Plan, the severance pay claim included in your letter dated February 18, 2003 and subsequent letter dated April 30, 2003 were referred to me as the Plan Administrator.
>
> My review concluded that you were offered 26 weeks severance pay in accordance with the Severance Pay Plan provisions for which you were eligible at the time of your termination. I have confirmed that the chronology of events and communications are accurate as stated in your severance review response dated January 13, 2003. The One Beacon severance eligibility as described in Attachment A was the available benefit to you. RAM adopted the Liberty Mutual Severance Pay Plan on January 1, 2002, and that plan was communicated to you upon notice of your termination of employment. The Liberty Mutual Severance Pay Plan (copy attached for your reference) in effect at the time of your termination included an exclusion as follows:
>
> 3.2 <u>Exclusions from Eligibility.</u> Notwithstanding anything herein to the contrary, a Participant shall not be eligible for benefits under the Plan if:
> . . . (c) he or she is entitled to severance benefits calculated or determined under any other plan or contractual agreement; . . .
>
> Mr. Gecht, the conclusion of my review of your severance appeal indicates Attachment A to the Former OneBeacon Severance Release was the applicable schedule of benefits available to you. Our records indicate you have already been paid the eligible severance benefit of $68,596.24 and no additional payment is due. According to the terms of the Severance Plan, this decision is final. . . .

(Letter from Helen E.R. Sayles to Sheldon Gecht, May 22, 2003, Ex.
A to Declaration of Debra Waldstein, Ex. 2 to Defendants'
Memorandum in Support of Motion for Summary Judgment.)

Waldstein's letter to plaintiff states in pertinent part:

. . . To complete my review of the circumstances of your
termination of employment effective March 15, 2002, I
consulted with the Regional Agency Markets and Indiana
Insurance. The following summarizes my review findings.

It is my understanding that you were advised by OneBeacon
of the protections negotiated by OneBeacon in the Master
Agreement between OneBeacon Insurance and Liberty Mutual
in a series of meetings held before year-end 2001. Those
special provisions included a guarantee of continued
severance payments under the OneBeacon severance plan and
a COBRA subsidy which would be in place for employees
terminated involuntarily (but not for performance)
through June 1, 2003. While the LRAMbound.com website is
no longer active, I believe it generally described
information about the RAM policies and procedures and the
RAM Severance Policy then in effect in 2001.

Upon Liberty's acquisition of the OneBeacon business, you
received an offer of employment with Indiana Insurance,
a subsidiary of Regional Agency Markets (RAM) and the
Liberty Mutual Group effective January 1, 2002. Also on
January 1, 2002, the Liberty Mutual Severance Pay Plan
was amended for former OneBeacon employees in order to
provide the level of severance benefits agreed upon in
the Master Agreement. I have enclosed a copy of
"Attachment A" which outlined those specific benefits for
which you were eligible as required by the Master
Agreement.

I also confirmed your receipt of the January 15, 2002
letter offering a retention agreement as you described.
Two retention periods were defined with a specified
payout to be made within 30 days after the end date of
each period subject to a number of requirements
associated with continued employment and satisfactory
performance. The letter also stipulated that a company
decision to eliminate the position of a participant in
the retention plan would result in payment of a pro rata

share of the retention bonus based on the length of time in the retention plan. Although you voiced disagreement with the idea of proration, you signed that retention agreement on January 21, 2002.

Business conditions dictated a compression of the business, and on February 27, 2002 you were notified by Human Resources that restructuring would result in the termination of your employment. You received a letter describing your termination date, retention payment, severance and other termination provisions and "Attachment A," which documented the OneBeacon Severance and COBRA provisions, as well as a copy of the Liberty Mutual Severance Pay Plan. In the meetings that took place, employees were advised that they would be paid severance according to the OneBeacon schedule of severance benefits, but that the Liberty Mutual Summary Plan Description described the administration of severance payment and was provided to explain how severance pay would be administered for them. The employees were also advised that the OneBeacon program had been limited to a lump sum severance payment but that, as described in the Liberty Mutual policy, employees would have the ability to elect biweekly payments if they preferred.

You then met with the Human Resources Representative and expressed your belief that, as a member of the OneBeacon Board of Directors, you were entitled to a special severance benefit. You were advised that the Master Agreement listed all special agreements to be honored by RAM and that yours was not included. You were told that you could petition OneBeacon for any special benefits to which you might be entitled as a result of your service on OneBeacon's Board.

Shortly after the distribution of the February 27 letter, an error was discovered in the calculation of the prorated retention bonus. Another letter was provided to you on March 8 to explain the erroneous calculation, the correct retention bonus payment and the specific methodology for the correct calculation. It is regrettable that confusion was caused by an administrative error resulting in a diminution of your retention bonus and I do apologize for the inconvenience that this caused.

> You now claim benefits under the Liberty Mutual Severance
> Plan. The Liberty Mutual Severance Plan provides in
> Article 3, Exclusions from Eligibility, Section 3.2(c)
> indicates [sic] that one shall not be eligible for
> benefits under the plan if, "he or she is entitled to
> severance benefits calculated or determined under any
> other plan or contractual agreement." The terms of your
> transferred employment to Indiana Insurance clearly
> provide that former OneBeacon employees are subject to
> the severance benefits included in "Attachment A". Based
> on my review, I concluded that you were offered the
> correct amount of severance benefits and retention bonus.
> . . .

(Letter from Debra Waldstein to Sheldon Gecht, January 13, 2003, at

1-2, Ex. A to Declaration of Debra Waldstein, Ex. 2 to Defendants'

Memorandum in Support of Motion for Summary Judgment.)

To summarize, the Plan Administrator, Sayles, denied

plaintiff's appeal because, in her view, Liberty's Severance Pay

Plan explicitly excluded participants from eligibility if they were

entitled to benefits "calculated or determined under any other plan

or contractual agreement." Plaintiff was entitled to benefits

under another plan or contractual agreement because "[t]he One

Beacon severance eligibility as described in Attachment A" to the

"Former OneBeacon Severance Release was the applicable schedule of

benefits available" to plaintiff. Sayles did not indicate why she

concluded that "Attachment A" applied to plaintiff, but Waldstein's

letter clarifies Liberty's position: "Attachment A" was derived

from the Master Agreement between OneBeacon and Liberty. Waldstein

informed Gecht that "[t]he terms of your transferred employment to

Indiana Insurance clearly provide that former OneBeacon employees

are subject to the severance benefits included in 'Attachment A.'"
From where these "terms" of employment are derived, Waldstein does
not explain, but her letter implies that they are from the Master
Agreement.

Thus, in support of its argument that the Plan Administrator's
decision was not arbitrary and capricious, Liberty relies upon the
terms of its Severance Pay Plan; "Attachment A"; and the Master
Agreement.  There are problems, however, with the evidence Liberty
submits.  First, it is unclear to which document "Attachment A" is
attached.  Sayles's letter indicates that "Attachment A" is an
exhibit to the "Former OneBeacon Severance Release," but it does
not appear that defendants have submitted that document.
"Attachment A" is an undated document that essentially contains the
same information regarding severance as "Schedule 5.09(c)," which
is quoted _infra_.

A second problem is that the version of the Severance Pay Plan
("SPP") Liberty relies upon is dated July 1, 2002, months after
plaintiff was terminated.  Plaintiff calls our attention to this
issue and submits a document entitled "Liberty Mutual Severance Pay
Plan" that states "Last Revision: 1/2002."  Liberty argues that
January 2002 document is a "Summary Plan Description" and that the
distinction does not matter because the July 2002 and the January
2002 versions are the same in all material respects--particularly

in that both provide that an individual is ineligible for the plan if eligible under another plan or contractual agreement.

It is difficult to understand why Liberty insists that the July 2002 version applies to Gecht; perhaps it is because both Waldstein and Sayles relied upon the July 2002 version of the Severance Pay Plan. That document could not have applied to plaintiff because he was terminated months earlier. The relevant plan document was not the July 2002 version, but the January 2002 version. Liberty should have acknowledged this problem in its initial brief instead of glossing over it in the hopes that plaintiff or the court would not notice, as Liberty is correct that the provisions of the January 2002 version of the Severance Pay Plan are substantially the same as those of the July 2002 version. Therefore, reliance on the January 2002 version would not have changed the conclusions of Waldstein and Sayles. The relevant portions of the January 2002 version are as follows:

> "Severance Benefits" means benefits paid in accordance with the terms of the Plan to any Participant who satisfies the eligibility requirements.
>
> "Participant" shall mean any full-time or part-time employee of the Company employed in the United States. "Participant" shall not include the following individuals as determined by the Plan Administrator, in his or her sole discretion:
> . . .
>> (b)    individuals eligible to receive similar benefits under the terms of another plan sponsored by the Company or pursuant to an agreement with the Company; . . .

> Some of the situations that make you ineligible for
> Severance Benefits include:
> . . .
> • you are entitled to severance benefits calculated
>   or determined under any other plan or contractual
>   agreement.

(Plaintiff's Rule 56.1 Statement, Ex. B, at 1-2.) The question
under both the January 2002 and July 2002 Plans was whether Gecht
was "eligible to receive similar benefits under the terms of
another plan sponsored by the Company or pursuant to an agreement
with the Company."

Waldstein and Sayles answered that question in the affirmative
and relied on the Master Agreement. Now we come to the third and
most critical problem that arises with Liberty's evidentiary
submissions. Liberty has submitted only three pages of the entire
Master Agreement--the cover page, a single portion of a single
paragraph regarding severance benefits for "Transferred Employees,"
and a page titled "Schedule 5.09(c)." The cover page states that
it is the "Master Agreement by and among White Mountains Insurance
Group Ltd., OneBeacon Corporation, and Liberty Mutual Insurance
Company." The short excerpt submitted by Liberty regarding
severance benefits--the crux of Liberty's motion--states as
follows:

> In lieu of providing benefits under the Liberty Group
> severance plans, Liberty shall cause the Liberty Group to
> provide the following severance pay and benefits to
> Transferred Employees terminated by Liberty prior to June
> 1, 2003: (x) severance pay in accordance with the
> criteria set forth on Schedule 5.09(c); (y) COBRA

subsidies or COBRA enhancements in accordance with the terms of the OneBeacon severance plan or policy applicable to the Business Employees as in effect on the date of Closing (the "OneBeacon Plan"); and, (z) outplacement benefits in accordance with the applicable Liberty Group plan ("Outplacement Benefits")

(Ex. A to Declaration of Debra Waldstein, Ex. 2 to Defendants' Memorandum in Support of Motion for Summary Judgment.) The third page submitted by Liberty states:

### Schedule 5.09 (c)
### Reimbursed Severance Payments

Any payment of severance benefits requires an executed release by the Business Employee. Severance benefits are not available to Business Employees who are terminated for performance reasons.
The schedule for severance benefits is as follows:

| Basic Formula | Complete Years of Service | Severance Weeks |
|---|---|---|
|  | ≤ 4 | 8 weeks base salary |
|  | 5 – 13 | 2 weeks base salary per year |
|  | 13 – 26 | 26 weeks base salary |
|  | 26+ | 1 week base salary per year |
| Minimum | 8 weeks | |
| Maximum | None, except as provided by formula | |

- Assistant Vice Presidents and Equivalent Regional Presidents' Direct Reporting Managers
  *Same as above but no less than 13 weeks*

- Vice Presidents & Equivalent Branch Managers
  *Same as above but not less than 26 weeks*

(Attachment to Declaration of Deborah Giss Stalker, Ex. 1 to Defendants' Memorandum in Support of Motion for Summary Judgment.)

Plaintiff complains that Liberty's "failure to produce the entire Master Agreement is . . . troubling and makes it impossible for the Court or plaintiff to analyze any other provisions within the Master Agreement." (Memorandum in Opposition to Motion for Summary Judgment at 3.) Liberty replies that it has "produced the relevant portions of the Master Agreement precisely as provided by the Court's order of July 20, 2004." (Reply at 5.) Liberty's Vice President and General Counsel of RAM, Deborah Giss Stalker, states in her Declaration that these documents are true and authentic copies of "portions of the Master Agreement, redacted pursuant to the Court's order, dated July 20, 2004, relating to the production of certain relevant portions of the confidential Master Agreement." (Declaration of Deborah Giss Stalker, Ex. 1 to Defendants' Memorandum in Support of Motion for Summary Judgment, at 2.)

Our order following the Rule 16 conference in this case did not direct defendants to "redact" portions of the Master Agreement. We provided that defendants would "produce relevant portions of the Master Agreement dated October 30, 2001 for plaintiff's inspection and copying and plaintiff shall keep the material confidential." (Minute Order of July 20, 2004.) Liberty has adopted an unreasonably restrictive position on what portions of the Master

Agreement are "relevant"--a position that is fatal to its summary judgment motion.

The Court has been provided absolutely no context for the above-quoted paragraph of the Master Agreement regarding severance benefits. We have not been told which section of the Master Agreement the paragraph appears in. We do not have the introductory portions of the Master Agreement. We do not have the definitions section of the Master Agreement, so we do not know what a "Transferred Employee" or a "Business Employee" is. We do not have the portion of the Master Agreement referred to by Waldstein that lists "all special agreements to be honored by RAM," which purportedly does not include plaintiff. We have no context for or other references to Schedule 5.09(c), so it is unclear why that schedule is labeled as "Reimbursed Severance Payments" and not simply "Severance Payments." Such provisions are obviously crucial to a full understanding of the Master Agreement. Liberty has failed to give the court the necessary information to decide whether the Plan Administrator's decision, which ultimately relied on the Master Agreement, was arbitrary and capricious. Accordingly, its motion for summary judgment with respect to the severance pay issue must be denied.

Liberty should have foreseen this result. It had fair notice from plaintiff's response that its failure to produce all relevant portions of the Master Agreement would be a significant issue.

Liberty stubbornly clung to its decision not to produce additional portions to either plaintiff or the court, and it attempts to deflect the argument by asserting that plaintiff "has had a full and fair opportunity to submit all information he deemed relevant to his claim for benefits." (Reply at 5.) The argument is neither here nor there. Gecht does not possess a copy of the Master Agreement; Liberty does. And in any event, it is Liberty's motion for summary judgment, so Liberty bears the burden of producing all relevant and necessary evidence in its possession.[2]

## B.  **Retention Bonus**

Plaintiff's complaint is brought under ERISA, 29 U.S.C. § 1132(a)(1)(B). The parties fail to address whether plaintiff's claim regarding his retention bonus is properly brought under ERISA. It does not appear to be, because the bonus at issue is not a benefit provided pursuant to an employee benefits plan. (Even though the Retention Bonus Agreement refers to a "plan," there are no documents outlining such a plan.) Moreover, although Waldstein addressed the retention bonus issue in her letter to plaintiff, Sayles, the Plan Administrator, did not address it in her denial of plaintiff's appeal. Plaintiff's theory seems to be contractual, see excerpt from plaintiff's brief, quoted <u>infra</u>. Accordingly, we

---

[2]  Because Liberty has not met its initial burden, there is no need to consider plaintiff's submissions at this point. Liberty's motion to strike portions of plaintiff's statement of additional material facts is therefore denied as moot.

view plaintiff's retention bonus claim as one for breach of contract.

Liberty contends that, assuming that the Retention Bonus Agreement was a contract, the evidence establishes that it did not breach that contract. According to Liberty, the terms of the agreement are clear and unambiguous; if Gecht was laid off before the end of the retention period, his bonus would be prorated based on the length of time he had remained employed. Gecht's employment was terminated eight weeks after the bonus letter was sent to him. Eight weeks constituted 29% of the first retention period, so Liberty awarded him 29% of $11,070.00 (the bonus applicable to the first retention period), which totaled $3,210.30.

Plaintiff filed two briefs in response to defendants' motion for summary judgment: a two-page "response" and an eight-page "memorandum in opposition." The "memorandum" does not respond at all to defendants' argument regarding the retention bonus; the "response" contains a single sentence of argument: "(1) the pro-ration should have been based on the promised bonus of $36,900.00, and not based on the first installment of said bonus; (2) alternatively, the letter promising a gross bonus of $10,701.00 constituted a unilateral contract; (3) alternatively, Defendants should be estopped from changing their interpretation of the retention bonus, the $10,701.00 being a pro-ration based on the

full bonus amount of $36,900.00." (Response to Motion for Summary Judgment, ¶ 1.)

The Retention Bonus Agreement provides that Gecht's payment would be "30% of [his] base pay as of 12/31/01 or $36,900.00 (before applicable taxes and withholding) <u>subject to the terms and conditions outlined below</u>" (emphasis added). One of those terms states that if plaintiff remained employed through August 1, 2002, he would receive 30% of his bonus, or $11,070.00. Another provides that if, prior to that date, Liberty eliminated plaintiff's position, his award distribution would be paid "on a pro-rata basis, based upon the length of time [he was] an active participant in the retention plan." Gecht's position was terminated on March 15, 2002, and the bonus was calculated as set forth <u>supra</u>. As defendants point out, plaintiff's contention that the bonus should be prorated based on the full bonus amount and not the bonus for the first retention period is contrary to the terms of the agreement. Twenty-nine percent of the full bonus amount would be $10,701.00, which is nearly the amount plaintiff would have received had he remained employed through August 1, 2002, five months beyond his termination. "Pro rata" is another way of saying "proportional," and a $10,701.00 bonus for two months is not proportional to a $36,900.00 bonus for over a year. Plaintiff's undeveloped arguments that the letter containing a miscalculated bonus figure was a unilateral contract, and that Liberty should be

"estopped from changing its interpretation" of the Retention Bonus Agreement are also rejected.

Defendants' motion for summary judgment will be granted as to plaintiff's breach of contract claim.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted in part and denied in part. The motion is denied as to plaintiff's ERISA claim for additional severance benefits, and it is granted as to plaintiff's breach of contract claim for additional retention bonus pay. Defendants' motion to strike portions of plaintiff's statement of additional material facts is denied as moot.

A status hearing in this case is set for September 14, 2005 at 11:00 a.m.

DATE:       August 25, 2005

ENTER:      _____
            John F. Grady, United States District Judge